07-0334-cv(L), 07-3524(CON)
Pyke v. Cuomo

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2008

(Argued: March 16, 2009                    Decided: May 27, 2009)

Docket Nos. 07-0334-cv(L), 07-3524(CON)

_____

JOSEPH H. PYKE, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF MATTHEW PYKE, MAY P. COLE, CHARLES BENEDICT, PATRICIA A.
BENEDICT, JULIUS M. COOK, BEVERLY J. PYKE, EDWARD SMOKE, SELENA M.
SMOKE, MARGARET PYKE THOMPSON, ON BEHALF OF THEMSELVES AND ALL
OTHER PERSONS SIMILARLY SITUATED,

*Plaintiffs-Appellants*,

-v.-

MARIO CUOMO, THOMAS A. CONSTANTINE, ROBERT B. LEU, AND RONALD R.
BROOKS,

*Defendants-Appellees*.

_____

Before: CALABRESI and WESLEY, *Circuit Judges*, and DRONEY, *District Judge*.[*]

_____

Appeal from a judgment of the United States District Court for the Northern District of

New York (McCurn, *J*.), granting summary judgment to Defendants on Plaintiffs' Equal

---

[*] The Honorable Christopher F. Droney, United States District Court for the District of
Connecticut, sitting by designation.

Protection claims. We hold that Plaintiffs have shown neither an express racial classification nor racially discriminatory intent and impact in Defendants' response to a period of violent unrest on an Indian reservation. Accordingly, the judgment is AFFIRMED.

_____

DAVID A. BARRETT (Jeffrey S. Shelly, *on the brief*) Boies, Schiller & Flexner, LLP, Albany, N.Y., *for Plaintiffs-Appellants*.

FRANK BRADY, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, and Andrew D. Bing, Deputy Solicitor General, *on the brief*), *for* Andrew M. Cuomo, Attorney General of the State of New York, Albany, N.Y., *for Defendants-Appellees Thomas A. Constantine, Robert B. Leu, and Ronald R. Brooks*.

Lawrence O. Kamin (Lisa D. Bentley, on the brief) Wilkie Farr & Gallagher LLP, New York, N.Y., *for Defendant-Appellee Mario Cuomo*.

_____

PER CURIAM:

This case arises from widespread, violent unrest on a Mohawk Indian reservation in New York in the late 1980s and early 1990s. At issue is the response of certain New York officials to that crisis. Plaintiffs, as representatives of a class, argue that Defendants—all of whom are government officials with some responsibility for the policing of Indian lands—violated Plaintiffs' rights under the Equal Protection Clause through their inadequate and at times harmful response to the unrest on the reservation. Plaintiffs allege that Defendants' actions contributed to millions of dollars in property damage and the deaths of two young Mohawks.

The case came before our Court once before, resulting in a short opinion which vacated the district court's grant of summary judgment for Defendants and remanded for application of

the proper Equal Protection standard.  *See Pyke v. Cuomo*, 258 F.3d 107 (2d Cir. 2001) ("*Pyke I*").  On remand, the United States District Court for the Northern District of New York (McCurn, *J.*) again granted summary judgment for Defendants, finding that their actions did not amount to an Equal Protection violation and that the officials were entitled to qualified immunity.  Plaintiffs appeal from this judgment and the District Court's subsequent denial of Plaintiffs' Rule 60(b) motion based on newly-discovered evidence.[1]  They argue: (a) that disputed issues of material fact preclude summary judgment on their claims of express racial classification (what Plaintiffs call their "strict scrutiny" argument), (b) that disputed issues of material fact regarding discriminatory impact and intent preclude summary judgment even on rational basis review, and (c) that qualified immunity is inappropriate.  We assume the parties' familiarity with the basic facts, which are briefly recounted in our first opinion.  *See Pyke I*, 258 F.3d at 108.

We review a grant of summary judgment *de novo*, examining the facts in the light most favorable to the non-moving party and resolving all factual ambiguities in that party's favor. *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.*, 444 F.3d 158, 162 (2d Cir. 2006).  Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

---

[1] Plaintiffs' appeal from the denial of the Rule 60(b) motion was docketed as 07-3524-cv and consolidated with the lead appeal.

3

There are many ways for a plaintiff to plead intentional discrimination in violation of the Equal Protection Clause. *Brown v. Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000). When the instant case was before us in *Pyke I*, we identified three common methods:

> [A] plaintiff seeking to establish a violation of equal protection by intentional discrimination may proceed in "several ways," including by pointing to a law that expressly classifies on the basis of race, a facially neutral law or policy that has been applied in an unlawfully discriminatory manner, or a facially neutral policy that has an adverse effect and that was motivated by discriminatory animus.

258 F.3d at 110. We noted that "[t]he present complaint sufficiently alleged each of the last two theories, as it charged the discriminatory withholding of police protection because the plaintiffs were Native American." *Id.* In the current appeal, it seems that Plaintiffs are attempting to establish a violation of equal protection by pointing to two of these theories, albeit not the same two we said in *Pyke I* were "sufficiently alleged" in the initial complaint. First, Plaintiffs assert the existence of an express classification, which was the only one of three themes mentioned in *Pyke I* that we did not say Plaintiffs had properly pled in their original complaint.[2] Second, Plaintiffs attempt to show that Defendants' actions—even if they did not amount to an express classification—had a discriminatory impact and were motivated by discriminatory intent. We consider each of these arguments in turn.

Under the Equal Protection Clause, certain "suspect" classifications are subject to strict judicial scrutiny. These include classifications based on race. *Loving v. Virginia*, 388 U.S. 1, 11 (1967); *see also Johnson v. California*, 543 U.S. 499, 505 (2005) (holding that "*all* racial

---

[2] Nevertheless, we assume that this argument is properly before us, notwithstanding the fact that (a) it was not specifically raised in Plaintiffs' initial complaint, and (b) that the complaint was not amended.

4

classification" imposed by government "must be analyzed by a reviewing court under strict scrutiny"). In order to satisfy strict scrutiny, a classification must further a compelling state interest and be narrowly tailored to accomplish the purpose. *Shaw v. Hunt*, 517 U.S. 899, 908 (1996).[3]

Plaintiffs point to three particular policies which they say involve express racial classification: (1) Defendants' decision, at various times, to set up roadblocks at the edge of the reservation either to stop non-residents from entering the reservation or else to give them information about the ongoing strife; (2) Defendants' policy of informing the "Warrior Society"—which Plaintiffs describe as a heavily armed Mohawk organization responsible for criminal violence on the reservation, *Pyke I*, 258 F.3d at 108—whenever police entered the reservation; and (3) the ceasing of regular patrols inside the reservation. Before undertaking to evaluate these actions through the lens of strict scrutiny, we must determine whether they amount to express racial classification at all. We do not think that they do.

First, absent some greater showing of an intent to classify based on race, the roadblocks policy is saved by the fact that it was aimed at an area, not a racial class. Defendants have explained that they were attempting to respect the sovereignty of the reservation, and only set up border checkpoints to keep out non-*residents*, not non-Native Americans. That is, Defendants believed, with sufficient reason, that there was a serious potential for violence on the reservation.

---

[3] This heightened scrutiny may apply somewhat differently when Congress intends to benefit Indians as a political class. *See Morton v. Mancari*, 417 U.S. 535, 555 (1974) ("On numerous occasions th[e Supreme] Court specifically has upheld legislation that singles out Indians for particular and special treatment. . . . As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed.").

Limiting access to that risky geographic area—or at least informing visitors about the risk—is no different in kind than imposing a curfew, or cordoning off a crime scene, or limiting access to an urban area during a period of riots. Of course, one might legitimately question the duration and scope of the roadblocks, but the question of whether or not the roadblocks were narrowly tailored to further the government's compelling interest is, at this stage, the wrong inquiry. One must first show the existence of a racial classification, before one scrutinizes it strictly and asks for narrow tailoring. The duration and reasonableness of the roadblocks cannot by themselves answer that first question, unless, for example, the roadblocks were so onerous that they could only be explained as a result of racial classification or racial animus. That is not the case here.

Of course, the complicating factor here is that geography and race are inevitably intertwined on a Native American reservation. The same may be true of other geographic areas where history and development have operated to create concentrations of the kinds of social groups (especially racial minorities) whose direct classification, under the Equal Protection Clause, is constitutionally suspect. In such areas, seemingly neutral geographic distinctions may in fact be being used as insidious proxies for suspect *racial* classifications. *See, e.g.*, *United States v. Bishop*, 959 F.2d 820, 825-26 (9th Cir. 1992) (finding that peremptory challenge based upon residency in Compton, a predominately black neighborhood, "reflected and conveyed deeply ingrained and pernicious stereotypes" about African-Americans). But in this particular case, Plaintiffs have not produced sufficient evidence to raise a material issue on whether the roadblocks were anything other than an effort—misguided or not—to contain and limit the impact of the violence on a geographic area. Accordingly, the policy is not by itself an *express* racial classification and is not subject to strict scrutiny on those grounds.

Similarly, Defendants' decision to notify the Warrior Society before entering the reservation in response to police calls was not an express racial classification. Viewed most favorably, the policy was simply a way for the police to avoid a potentially violent standoff with the Warriors, and perhaps even to show respect for the sovereignty of the Mohawks. Viewed at its worst, it was horribly misguided policing that effectively meant caving in to the demands of a criminal organization and ceding to it control over the protection of thousands of Mohawks. But even on this most negative reading, the notification policy was not an express racial classification.

For essentially the same reasons as apply to the roadblocks and notification procedure—and with the same caveats— the suspension of patrols on the reservation was also not an express racial classification.

Having failed to show an express racial classification, Plaintiffs could nonetheless prevail on their Equal Protection claims if they could demonstrate that Defendants' actions were "motivated by discriminatory animus and [their] application results in a discriminatory effect." *Jana-Rock Constr., Inc. v. New York State Dep't of Econ. Dev.*, 438 F.3d 195, 204 (2d Cir. 2006) (*quoting Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886). "Plaintiffs challenging such facially neutral laws on equal protection grounds bear the burden of making out 'a prima facie case of discriminatory purpose.'" *Jana-Rock*, 438 F.3d at 204 (*quoting Washington v. Davis*, 426 U.S. 229, 241 (1976).

Assuming without deciding that Plaintiffs have shown the existence of a discriminatory impact, they have nonetheless failed to proffer enough evidence of discriminatory *intent* to survive summary judgment. We have carefully considered the testimonial and documentary

evidence Plaintiffs presented, and we conclude that it does not suffice to raise a material issue on the existence of such intent. Accordingly, we find that Plaintiffs' Equal Protection claims fail on this ground as well.

The violence on the Mohawk reservation was an indisputable tragedy. But Plaintiffs have not shown that Defendants' attempts to avert it, however unsuccessful they might have been, were a violation of the Equal Protection Clause. Accordingly, we AFFIRM the judgment of the District Court.